IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Glenda J. Mooneyham, *on behalf of herself and all others similarly situated*, <br><br> Plaintiff, <br><br> v. <br><br> Bitcoin Depot, Inc.; Bitcoin Depot Operating, LLC *d/b/a* Bitcoin Depot; Circle K Stores, Inc., <br><br> Defendants. | Case No. 3:24-cv-01774-JDA <br><br> **OPINION AND ORDER** |

This matter is before the Court on a motion to compel arbitration and to stay or, in the alternative, to strike class allegations and to dismiss by Defendant Circle K Stores, Inc. ("Circle K") [Docs. 10; 11] and a motion to compel arbitration and stay action or, in the alternative, to dismiss and strike class allegations by Defendants Bitcoin Depot Operating, LLC and Bitcoin Depot, Inc. (collectively, the "Bitcoin Depot Defendants") [Doc. 12]. Plaintiff filed this action in the Richland County Court of Common Pleas, and Defendants removed it to this Court based on diversity jurisdiction under 28 U.S.C. § 1332(a). [Docs. 1; 1-1.] Circle K and the Bitcoin Depot Defendants filed their motions on June 3, 2024. [Docs. 10; 11; 12.] Plaintiff filed responses to the motions [Docs. 24; 25], and Circle K and the Bitcoin Depot Defendants filed replies [Docs. 30; 31]. These motions are ripe for consideration.

**BACKGROUND**

**The Complaint's Allegations**[1]

Plaintiff alleges that she is a recently widowed, 73-year-old woman who was the target and victim of a cryptocurrency ATM scam. [Doc. 1-1 ¶¶ 31–32.] Imposters claiming to represent Plaintiff's bank and the Federal Trade Commission ("FTC") called her on November 15, 2023, and told her that her bank account had been compromised and was being investigated by the FTC. [*Id*. ¶ 32.] The caller advised that someone was attempting to withdraw all of Plaintiff's money from her account via online transfers and that, to protect her money, Plaintiff had to withdraw it from the bank and deposit it into a Bitcoin wallet created for her by the bank via a Bitcoin Depot ATM at the local Circle K convenience store. [*Id*.]

That same day, at the instruction of the alleged scammers, Plaintiff withdrew $15,000 in cash from her savings account, took the cash to a Circle K store located in Lexington, South Carolina, and deposited the entirety of the cash into the Bitcoin Depot ATM located there using a QR code sent by the scammers. [*Id*. ¶¶ 33–35.] Plaintiff did this while receiving instructions from a person on her cellphone. [*Id*. ¶ 35.] Plaintiff alleges that Circle K and its employees made no meaningful effort to intervene, to warn Plaintiff that the Bitcoin Depot ATM was known for being part of such scams, or to warn Plaintiff that she may be in the process of being scammed. [*Id*. ¶ 36.] Less than 48 hours later, Plaintiff withdrew another $15,000 in cash from her savings account at the instruction of the scammers. [*Id*. ¶ 38.] Again, Plaintiff took the cash to the same Circle

---

[1] The Court summarizes only those allegations from the Complaint that are relevant to the determination of whether Plaintiff's claims are subject to arbitration. Plaintiff's remaining allegations are not addressed herein.

K store and deposited the entirety of the cash into the Bitcoin Depot ATM located there. [*Id*. ¶ 39.]

Plaintiff now seeks to bring a class action on behalf of "[a]ll persons who have suffered damages as a result of the dangers created and/or enabled [by] Defendants' lack of due care in attending to . . . the use of Bitcoin Depot ATM machines in predatory scams against the elderly." [*Id*. ¶¶ 46–57.] Plaintiff asserts causes of action against the Bitcoin Depot Defendants under South Carolina's Omnibus Adult Protection Act ("SCOAA") [*id*. ¶¶ 58–65]; for negligence, gross negligence, recklessness, and willful and wanton conduct [*id*. ¶¶ 66–67]; for voluntary assumption of a duty [*id*. ¶¶ 68–70]; for negligent design and failure to warn [*id*. ¶¶ 71–73]; for strict products liability under S.C. Code Ann. § 15-73-10 [*id*. ¶¶ 74–79]; and for breach of implied warranties [*id*. ¶¶ 80–83]. She also asserts claims against the Bitcoin Depot Defendants and Circle K under the South Carolina Unfair Trade Practice Act ("SCUTPA") [*id*. ¶¶ 84–86] and for public nuisance [*id*. ¶¶ 87–91], and against Circle K for premises liability [*id*. ¶¶ 92–101].

**The Purported Arbitration Agreement**

In support of their motion to compel arbitration, the Bitcoin Depot Defendants attached the declaration of Scott Buchanan, Chief Operating Officer at Bitcoin Depot, Inc., and Bitcoin Depot's Terms and Conditions in place at the time of Plaintiff's transactions. [Doc. 12-1.] Buchanan explained that Bitcoin Depot ATMs are located inside various convenience stores across the country, including Circle K stores, and that Circle K is a marketing partner of Bitcoin Depot Operating, LLC. [*Id*. at 2 ¶ 5.] Buchanan explained that Bitcoin Depot's Terms and Conditions provide:

> The parties hereby agree to arbitrate all claims that may arise under the Agreement. Without limiting the foregoing, should

3

> a dispute arise between the parties (including the Covered Parties) including, without limitation, any matter concerning the Bitcoin Depot Offerings, the terms and conditions of the Agreement or the breach of the same by any party hereto: (a) the parties agree to submit for resolution by arbitration before the American Arbitration Association ("AAA") in Atlanta, GA, in accordance with the current Commercial Arbitration rules of the AAA . . .

and

> THE AGREEMENT CONTAINS DISCLAIMERS OF WARRANTIES, LIMITATIONS OF LIABILITY, RELEASES, A CLASS-ACTION WAIVER, AND THE REQUIREMENT TO ARBITRATE ANY AND ALL CLAIMS THAT MAY ARISE HEREUNDER AGAINST BITCOIN DEPOT, AS WELL AS ITS PARENT, SUBSIDIARIES, RELATED PARTIES, THIRD-PARTY SERVICE PROVIDERS AND MARKETING PARTNERS (COLLECTIVELY, "COVERED PARTIES"), WHO ARE EXPRESS THIRD-PARTY BENEFICIARIES OF THE MANDATORY ARBITRATION PROVISION. THE AFOREMENTIONED PROVISIONS ARE AN ESSENTIAL BASIS OF THE AGREEMENT.

[*Id*. at 2 ¶ 6; *see id.* at 7, 24.]

Buchanan further explained that, upon initiating a transaction with the ATM, the machine displays numerous informational prompts to the user, requiring the user to read and accept the prompts to complete a transaction at the ATM. [*Id*. at 2 ¶ 7.] One such prompt requires the user to accept Bitcoin Depot's Terms and Conditions by selecting "I accept these terms and conditions" to continue the transaction. [*Id*. at 3 ¶ 7(d); *see id.* at 35.] Buchanan explained that Plaintiff selected "I accept these terms and conditions" to continue her transactions while using the ATM on two occasions, as she would not have

4

been able to proceed with her transactions without agreeing to the Terms and Conditions.[2]  [*Id*. at 3–4 ¶ 8.]

## APPLICABLE LAW

**Motion to Compel Arbitration**

The Federal Arbitration Act ("FAA") establishes a "strong federal public policy in favor of enforcing arbitration agreements" and is designed to "ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 217, 219 (1985).  The FAA was enacted "in 1925 in order to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements on the same footing as other contracts."  *Snowden v. CheckPoint Check Cashing*, 290 F.3d 631, 639 (4th Cir. 2002) (internal quotation marks omitted). "Underlying this policy is Congress's view that arbitration constitutes a more efficient dispute resolution process than litigation." *Adkins v. Lab. Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002).

The FAA provides that arbitration clauses in contracts involving interstate commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2. Under the FAA, a district court must compel arbitration and stay court proceedings if the parties have agreed to arbitrate their dispute.  *Id*. §§ 2, 3.  But, if the "making of the arbitration agreement or the failure, neglect, or refusal to perform the same" is in issue, a district court must first decide whether the arbitration clause is enforceable against the parties.

---

[2] Buchanan further explained that Plaintiff's selections were recorded by the ATM in metadata, which he has reviewed.  [Doc. 12-1 ¶ 8.]

5

*Id*. § 4. "'[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Drews Distrib., Inc. v. Silicon Gaming, Inc.*, 245 F.3d 347, 349 (4th Cir. 2001) (internal quotation marks omitted).

A party seeking to compel arbitration must establish the following four elements: (1) the existence of a dispute between the parties; (2) a written agreement that includes an arbitration provision purporting to cover the dispute; (3) the relationship of the transaction, as evidenced by the agreement, to interstate or foreign commerce; and (4) the failure, neglect, or refusal of a party to arbitrate the dispute. *Am. Gen. Life & Accident Ins. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005). "[E]ven though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Adkins*, 303 F.3d at 501 (internal quotation marks omitted). "Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation." *Id*. "Defendant, as the party seeking to enforce the Agreement, bears the initial burden of persuading this court that the parties entered into an enforceable arbitration agreement." *Gordon v. TBC Retail Grp., Inc.*, No. 2:14-cv-03365-DCN, 2016 WL 4247738, at *5 (D.S.C. Aug. 11, 2016) (internal quotation marks omitted). "If defendant makes such a showing, then the burden shifts to the plaintiff[s] to show that even though there was some written contract, [they] did not actually agree to it-because the[ir] signature was forged, the terms of the contract were misrepresented, or some other reason evincing lack of true agreement." *Id.* (alterations in original) (internal quotation marks omitted). Where a valid arbitration agreement exists and covers the claims at issue, this Court has "no choice but to grant a motion to compel arbitration." *Adkins*, 303 F.3d at 500.

**Remedy When Arbitration is Compelled**

The FAA requires a court to stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement in writing for such arbitration, and "[t]his stay-of-litigation provision is mandatory." *Adkins*, 303 F.3d at 500 (internal quotation marks omitted); *see also* 9 U.S.C. § 3. But, the Fourth Circuit has held that if all of the claims asserted in a complaint are subject to arbitration, dismissal of the complaint is "a proper remedy." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir. 2001). Although the Fourth Circuit has acknowledged the inconsistency between its opinions on this issue, *see Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 376 n.18 (4th Cir. 2012) ("There may be some tension between our decision . . . indicating that a stay is required when the arbitration agreement 'covers the matter in dispute'—and *Choice Hotels*—sanctioning dismissal 'when all of the issues presented . . . are arbitrable.'" (second alteration in original)), "courts in this district continue to follow the holding of *Choice Hotels* and have dismissed actions when all the claims are arbitrable," *Fowler v. Dolgencorp, LLC*, No. 6:23-cv-05179-JDA, 2024 WL 1445408, at *2 n.* (D.S.C. Apr. 3, 2024).

## DISCUSSION

**Motion to Compel Arbitration**

Defendants seek to compel arbitration of the claims alleged in Plaintiff's Complaint pursuant to the Terms and Conditions Plaintiff accepted to complete her transactions at the Bitcoin Depot ATM. [Docs. 11 at 7–9; 12 at 8–9.] Plaintiff, on the other hand, contends that Defendants' motions to compel arbitration must be denied because Plaintiff was

7

under duress when she "agreed" to the Terms and Conditions at issue and, thus, there is no legally enforceable agreement under the FAA. [Docs. 24 at 9–13; 25 at 10–14.]

Applying the Fourth Circuit's four-factor test from *American General*, the Court concludes that Defendants have established each of the elements required to compel arbitration. *See* 429 F.3d at 87. The first, third, and fourth elements do not appear to be in dispute, and the Court briefly addresses those. A dispute exists between the parties as evidenced by the allegations in Plaintiff's Complaint. [Doc. 1-1.] The Agreement is related to interstate commerce, as Plaintiff deposited cash into a Bitcoin Depot ATM in South Carolina, and the cash was then converted into Bitcoin by the Bitcoin Depot Defendants, which are Delaware companies. [Docs. 1-1 ¶¶ 34, 39; 12-1 at 1 ¶¶ 3–4]; *see Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272–75 (1995). And, Plaintiff has refused to arbitrate this action as evidenced by her filing this lawsuit in court and her opposing Defendants' motions to compel arbitration. [Docs. 1-1; 24; 25.] Accordingly, the only disputed element is whether the parties entered into a written agreement that includes an arbitration provision purporting to cover the dispute.

Here, Defendants have carried their initial burden of persuading the Court that the parties entered into an enforceable arbitration agreement through Buchanan's declaration that Plaintiff selected "I accept these terms and conditions" to continue her transactions while using the ATM on two occasions and that she would not have been able to proceed with her transactions without agreeing to the Terms and Conditions, which included an agreement to arbitrate. [Doc. 12-1 at 2 ¶ 6, 3–4 ¶ 8; *see id.* at 7, 24.] In response, Plaintiff does not dispute that she selected "I accept these terms and conditions" to continue her transactions and, instead, argues that she was under duress when she "agreed" to the

8

terms and conditions at issue and, thus, there is no legally enforceable agreement.  [Docs. 24 at 9–13; 24-2; 25 at 10–14; 25-2.]

A party may challenge the validity of an agreement under § 2 of the FAA in two ways: first, she may specifically challenge the validity of the agreement to arbitrate and, second, she may challenge the contract as a whole, either on a ground directly affecting the entire agreement or on the ground that the illegality of one provision renders the whole contract invalid.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006).  In *Buckeye*, the challenge was to the contract as a whole, including the arbitration provision, arguing that the contract was invalid because of a usurious finance charge.  *Id.*  Because the challenge was to the contract, but not specifically to the arbitration provision, the Court held that the challenge should be considered by an arbitrator, and not a court.  *Id.* at 446.  Thus, where a plaintiff's argument is that a contract as a whole is unenforceable, an arbitrator decides the validity of the contract; in contrast, where a plaintiff argues that an arbitration clause itself is unenforceable, a court decides the validity of the clause.[3]

Here, Plaintiff challenges her agreement to the Terms and Conditions as a whole and not just the arbitration clause.  [Docs. 24 at 4 (arguing that Plaintiff was "incapable of exercising free will to voluntarily assent to the terms and conditions, including the arbitration agreement, which rendered the entire contract unenforceable"), 9 (arguing that the "terms and conditions, including the arbitration clause, are invalid and

---

[3] No party has specifically addressed whether it is for the Court or for an arbitrator to determine if Plaintiff must arbitrate this dispute.  However, under *Buckeye*, the Court must first determine this threshold issue.

unenforceable"); 25 at 4 (arguing that Plaintiff was "incapable of exercising free will to voluntarily assent to the terms and conditions, including the arbitration agreement, which rendered the entire contract unenforceable"), 10 (arguing that the "terms and conditions, including the arbitration clause, are invalid and unenforceable").] Accordingly, the issue of the validity of the contract is for an arbitrator to decide.[4]  *See Buckeye*, 546 U.S. at 444–45.

Moreover, the Court concludes, and Plaintiff does not dispute, that Plaintiff's claims in this action are covered by the arbitration provisions in the Terms and Conditions. Evaluation of this factor requires the Court to ask "whether the arbitration agreement is susceptible of an interpretation that covers the asserted dispute." *Mey v. DIRECTV, LLC*, 971 F.3d 284, 292, 294 (4th Cir. 2020) (quotation marks and citation omitted) (reversing a district court's determination that the disputed claims fell outside the scope of the arbitration agreement and stating, "[i]n light of the expansive text of the arbitration

---

[4] Plaintiff argues that no agreement was ever formed because she was under duress when she agreed to the Terms and Conditions. [Docs. 24 at 9 (arguing that "the 'contract' never came into being" and that "the contract and arbitration provision never formed"), 10 n.4 (asserting that "Plaintiff contests the formation of the contract"), 13 n.6 (arguing that "the defense of duress . . . challenges the existence of the contract itself"); 25 at 10 (arguing that "the 'contract' never came into being" and that "the contract and arbitration provision never formed"), 14 n.6 (arguing that "the defense of duress . . . challenges the existence of the contract itself").] However, "[d]uress is a defense to an otherwise valid contract." *Holler v. Holler*, 612 S.E.2d 469, 475 (S.C. Ct. App. 2005). Accordingly, Plaintiff's duress argument is not among those outside of the holding in *Buckeye*. *See Buckeye*, 546 U.S. at 444 n.1 (noting that "[t]he issue of the contract's validity is different from the issue [of] whether any agreement between the [parties] was ever concluded" and clarifying that the *Buckeye* opinion "addresses only the former"). Here, there is no question that an agreement was formed when Plaintiff selected "I accept these terms and conditions" to continue her transactions. Instead, Plaintiff merely argues she should not be bound by the agreement because she agreed under duress. As noted, that issue is for an arbitrator to decide. *See Neville v. Terminix Int'l Co.*, No. PJM 06-467, 2006 WL 8457070, at *4 (D. Md. July 28, 2006).

agreement, the categories of claims it specifically includes, and the parties' instruction to interpret its provisions broadly, we must conclude that it is "'susceptible of an interpretation'" that covers [the plaintiff's] claims."). As stated, the Terms and Conditions provide that the parties "agree to arbitrate all claims that may arise under the Agreement" and include "the requirement to arbitrate any and all claims that may arise hereunder against Bitcoin Depot, as well as its parent, subsidiaries, related parties, third party service providers and marketing partners." [Doc. 12-1 at 2 ¶ 6; *see id.* at 7, 24.] Thus, the arbitration provisions in the Terms and Conditions cover the claims at issue in this case because Plaintiff's claims are all related to her use of the Bitcoin Depot ATM and are against the Bitcoin Defendants and Circle K, a marketing partner of Bitcoin Depot Operating, LLC. [*See* Docs. 1-1; 12-1 at 2 ¶ 5.]

Accordingly, Defendants have satisfied the second element required to compel arbitration—a written agreement that includes an arbitration provision purporting to cover the dispute—and Defendants' motions to compel arbitration are therefore granted.[5]

**The Proper Remedy**

Having concluded that arbitration should be compelled in this case, the Court must now consider whether to stay or dismiss this action. As noted, "courts in this district continue to follow the holding of *Choice Hotels* and . . . dismiss[] actions when all the claims are arbitrable." *Fowler*, 2024 WL 1445408, at *2 n.*. Because each cause of action in Plaintiff's Complaint falls within the scope of the arbitration provisions in the Terms and Conditions, the Court concludes that dismissal of this matter is appropriate.

---

[5] Because the Court concludes that arbitration should be compelled in this case, it need not address the parties' remaining arguments related to the pending motions.

**CONCLUSION**

Based upon the foregoing, the motions to compel arbitration filed by Defendants Circle K Stores, Inc.; Bitcoin Depot Operating, LLC; and Bitcoin Depot, Inc. [Docs. 10; 12] are GRANTED, and this action is DISMISSED without prejudice.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

February 27, 2025
Columbia, South Carolina